aεε

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINIOS
EASTERN DIVISION

| | |
|---|---|
| ACE HARDWARE CORPORATION, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:12-cv-01479 |
| ADVANCED CAREGIVERS, LLC d/b/a | ) |
| HIALEAH ACE HARDWARE, and | ) |
| WILLIAM BLOODWORTH, | ) |
| On Behalf of Themselves and | ) |
| All Others Similarly Situated, | ) |
| | ) Judge John W. Darrah |
| Respondents. | ) |

## MEMORANDUM OPINION AND ORDER

Respondents, Advanced Caregivers, LLC d/b/a Hialeah Ace Hardware and William Bloodworth, recently commenced a class-action lawsuit against Petitioner, Ace Hardware Corporation ("Ace"), in the United States District Court for the Southern District of Florida. The lawsuit in Florida alleges Ace defrauded Respondents, and others similarly situated, in connection with the decision to acquire and develop Ace franchises. Ace demanded Respondents submit their disputes to arbitration in accordance with the terms of the parties' purported arbitration agreements. Respondents refused the demand to arbitrate and persisted in their lawsuit. Then, Ace filed a Petition to Compel Arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, in this District. Ace's Motion to Compel Arbitration is fully briefed and ripe for ruling.

### BACKGROUND

"Courts treat motions to compel arbitration as assertions that they are deprived of subject matter jurisdiction during the course of arbitration. Accordingly, for purposes of this motion, the

1

court draws the background facts from the parties' pleadings, but will also consider attached exhibits and affidavits." *Reineke v. Circuit City Stores, Inc.*, No. 03-CV-3146, 2004 WL 442639, at *1 (N.D. Ill. March 8, 2004) (citations omitted). Ace is a retailer-owned cooperative of hardware stores. (Pet'r's Mem. at 2.) There are over 4,400 independent Ace retailers in the United States, operated by 3,000 individual members. (*Id.*) Each of the individual members executes both an Ace Hardware Membership Agreement ("Membership Agreement") and an Ace Brand Agreement ("Brand Agreement") in order to operate an Ace store. (*Id.*) The Membership Agreement grants signees membership in Ace's cooperative, which permits members to purchase goods and services from Ace. (*Id.*) The Brand Agreement enables members to operate a retail store and use Ace's trademarks. (*Id.*)

In October 2008, Respondents contacted Ace regarding franchise opportunities. (Resp'ts' Resp. at 1.) After exchanging various documents and information, Ace sent Respondents both the Brand and Membership Agreements. (*Id.*) On January 8, 2009, Respondents signed franchise documents, including the Brand Agreement, Membership Agreement, and a Capital Stock Subscription. (*Id.*) After signing, Respondents returned the Agreements to Ace, along with the required $5,000.00 fee. (*Id.*) None of the Agreements signed by Respondents at this time contained an arbitration provision. (Resp'ts' Resp. Ex. 1A-1B.) Ace sent Respondents a letter, dated January 28, 2009, "tentatively approv[ing]" the Membership Agreement contingent upon receipt of further documentation. (Resp'ts' Resp. at 1.) Ace provided Respondents with Formal Approval of their membership on February 19, 2009. (*Id.*) On February 25, 2009, Ace provided Respondents with the fully executed Brand and Membership Agreements. (*Id.* at 1-2.)

In a letter, dated May 26, 2009, Ace notified Respondents that the Brand and Membership Agreements contained an error regarding the address of Respondents' store. (*Id.* at 2.) The letter from Ace provided: "Our District Manager, Jaime Gonzalez has informed us of the address change for your store referenced above. In view of this change, we will need you to sign the following documents reflecting the new address of your store." (*Id.* Ex. 4.) In order to correct the error in the previous Agreements, Ace asked Respondents to sign revised Brand and Membership Agreements. (*Id.* at 2.) The second set of Agreements did not include information regarding Ace's approval of the Respondents' franchise. (*Id.*) The actual location of the store never changed; but, rather, the first set of Agreements identified the wrong street address. (*Id.*) Respondents signed the second set of Agreements on June 16, 2009, after the opening of the new store. (*Id.*)

Besides the change in the store address, apparently unbeknownst to Respondents, the second set of Brand and Membership Agreements from Ace also contained arbitration provisions, which were not included in the first set of Agreements. (*Id.* at 3.) Additionally, the second set of Agreements also eliminated the provision listed in Article V(1)(b) of the first Brand Agreement, which allowed Ace to bring any dispute, arising out of the relationship, in an Illinois court. (*Id.* Ex 1A, 1B, 1E.) Though the first set of Agreements, signed on January 8, 2009, did not include arbitration clauses, Ace submits that it began regularly including arbitration clauses in its agreements on March 26, 2009. (*Id.* at 3.) On January 6, 2012, Respondents filed the underlying action in Florida, on behalf of themselves and a putative nationwide class, alleging Ace defrauded them in connection with Respondents' decision to acquire an Ace franchise. (Pet'r's Mem. at 3.) Ace claims all of the allegations contained in

Respondents' complaint fall within the arbitration provisions found in the second set of Agreements and now seeks to compel arbitration. (*Id.* at 4.)

**LEGAL STANDARD**

Congress enacted the Federal Arbitration Act ("FAA") to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 288–89 (2002) (*Waffle House*) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). When a contract contains an arbitration provision, the provision "shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *Waffle House*, 534 U.S. at 289.

The Supreme Court has stated, "[t]here are two types of validity challenges under § 2 [of the FAA]: "One type challenges specifically the validity of the agreement to arbitrate," and "[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). "Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772 (2010). Furthermore, "[i]f a party challenges the validity under § 2 [of the FAA] of the precise

4

agreement to arbitrate . . . the federal court must consider the challenge before ordering compliance with the agreement under § 4." *Id.*

When the making of the arbitration agreement is "in issue, the court shall proceed summarily to a trial thereof." *Id.* The FAA does not identify an evidentiary standard a party seeking to avoid compelled arbitration must meet, however, the evidentiary standard employed by most courts is similar to the standard used in deciding motions for summary judgment under Fed. R. Civ. P. 56. *Van Tassell v. United Marketing Group, LLC*, 795 F. Supp. 2d 770, 787 (N.D. Ill. 2011) (*Van Tassell*). Accordingly, "[t]he party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Id.* (quoting *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002) (*Tinder*)). Similar to summary judgment, when a court decides whether there is a genuine issue of material fact for trial, the evidence of the party opposing the compelled arbitration "is to be believed and all justifiable inferences are to be drawn in its favor." *Id.* (internal quotations and citations omitted). Arbitration cannot be avoided, however, "by generally denying the facts upon the right to arbitrate rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* (citation omitted).

## ANALYSIS

Ace contends Respondents must be compelled to arbitrate based on the arbitration provisions found in the second set of Agreements signed by Respondents on June 16, 2009. (Pet'r's Mem. at 1-2.) Ace points to the fact that both of *these* Agreements contain mandatory arbitration clauses, which cover:

> [a]ny dispute, controversy or claim arising out of or relating to: a) this Agreement or any other agreement between the Company and the Member . . . or b) the relationship between Company and member . . . shall be settled by arbitration

5

administered by the American Arbitration Association in accordance with its then current commercial arbitration rules.

(*Id.* at 2-3.) Ace contends that because Respondents' allegations in the underlying suit in Florida arise out of their relationship, arbitration is required.

The crux of Respondents' position, however, is that they were unaware that they were agreeing to arbitration when they received the second set of Agreements, after executing a first set of agreements, which lacked an arbitration clause, and that, therefore, there never was an agreement between the parties to arbitrate. Respondents propose one of two scenarios transpired. First, Ace, upon discovering the address error, might have simply unintentionally sent Respondents a second set of Agreements with arbitration clauses, unwittingly sending Respondents their updated "form" agreements rather than the agreements the parties had originally executed. (Resp'ts' Resp. at 3-4.) The second possible scenario, Respondents argue, is that Ace slipped in the arbitration terms without any agreement by the parties, thereby voiding the arbitration provisions due to procedural unconscionability or fraud. (*Id.*)

Before determining whether a dispute between the parties falls within the parameters of an arbitration agreement, it must be established that a contract exists between the parties to arbitrate. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) (*Janiga*). In *Janiga*, a district court denied a motion to compel arbitration where the Plaintiff alleged he did not and could not read the agreement he signed due to his limited proficiency with the English language. The Seventh Circuit reversed, finding sufficient facts in the record to find that a contract had existed between the parties. *Id.* The Seventh Circuit held that it was the "court's job [as opposed to the arbitrator's] to decide whether a contract exists." *Id.* at 741.

State law governs contract formation. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Illinois law, the analysis starts by "addressing whether the 'basic

6

ingredients' of a contract — offer, acceptance, and consideration — are present." *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006). Here, the parties appear to agree that the June 2009 Agreements are valid contracts. Ace asserts that the June 2009 Agreements are valid contracts between the parties. (Pet'r's Mem. at 1-2.) Respondents further provide that their opposition to the motion to compel arbitration "goes to the validity of the arbitration clause, itself – not to the terms of the overall contract." (Resp'ts' Resp. at 10 n.2.)

Because Respondents challenge the validity of the arbitration clause, they must "identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder*, 305 F.3d at 735. Respondents attack the arbitration provision with multiple arguments. First, as set out above, Respondents claim the insertion of the arbitration clause was an unintentional mistake by both parties. (Resp'ts' Resp. at 8.) Next, they claim the arbitration clause is unenforceable because: (1) Ace failed to provide notice of the inclusion of the arbitration clause; (2) the arbitration clause is procedurally unconscionable; or (3) the Respondents were induced to agree to the arbitration provision by fraud. (*Id.* at 11-15.)

*Mutual Mistake*

A basic principle of contract law provides that "in order to be binding, a contract requires a 'meeting of the minds' and a manifestation of 'mutual assent.'" *Van Tassell*, 795 F. Supp. 2d at 789 (citations omitted). However, a mistake by a party in the formation of an agreement can prevent a meeting of the minds. *Roman v. Delta Air Lines, Inc.*, 441 F. Supp. 1160, 1166 (N.D. Ill. 1977). In determining whether the parties had a meeting of the minds, consideration is given to what was expressed in writing, not by the parties' actual, subjective intent. *Abbott Lab. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999). Illinois law, applicable in issues of contract formation, follows the "four corners" rule: "An agreement, when reduced to writing,

must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Kelly v. McGraw-Hill Companies, Inc.*, Case No. 10-CV-4229, 2012 WL 3542258, at *4 (N.D. Ill. Aug. 17, 2012) (quoting *Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (1962)).

Claims of mutual mistake are subjected to heightened pleading standards, and mutual mistakes are "rarely found in commercial transactions between sophisticated parties." *Benkovitch v. eMed Monitoring, Inc.*, Case No. 04-CV-4393, 2004 WL 2980640, at *2 (N.D. Ill. Dec. 17, 2004) (citing *RS & P/WC Fields L.P. v. BOSP Invs.*, 829 F.Supp. 928, 969 (N.D.Ill. 1993)).

Here, the second set of Agreements contained arbitration provisions; Respondents signed these Agreements. Respondents suggest that Ace simply made a mistake in sending the second set of Agreements, perhaps unaware they included arbitration provisions, which were not part of the initial, bargained-for agreement between the parties. This argument is unavailing, however, because the analysis here must focus solely on what was put in writing.[1] Respondents received a second set of Agreements with a new provision added, and they signed them. "[I]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) (*Paper Exp.*). Here, Ace expressed in writing its desire to arbitrate

---

[1] Moreover, to the extent Respondents seek a reformation of the contract, they are required to show *clear and convincing evidence* that "at the time the agreement was reduced to writing and executed, some agreed upon provision was omitted or one not agreed upon was inserted either through mutual mistake or through mistake by one party and fraud by the other." *Indiana Ins. Co. v. Pana Community Unit School Dist. No. 8*, 314 F.3d 895, 904 (7th Cir. 2002) (citing *Alliance Syndicate v. Parsec, Inc.*, 741 N.E.2d 1039, 1048 (2000)). The letter relating to the change in address to the second set of contracts falls short of the clear and convincing standard.

disputes between the parties and, by signing the second set of Agreements, Respondents agreed. Under the law, Respondents are presumed to have read the contract before signing it. Therefore, Respondents' claim of mutual mistake fails.

*Failure to Give Notice*

Next, Respondents claim Ace failed to provide Respondents with notice that the second set of Agreements included arbitration provisions. However, Respondents cite to no law which requires a notice in this regard. Illinois contract law provides, "[i]t is not the duty of one party to a contract to inform another of the duties or obligations assumed under the contract." *Zerjal v. Daech & Bauer Const. Inc.*, 939 N.E.2d 1067, 1075 (Ill. App. Ct. 2010). "[A] party who agrees to terms in writing without understanding those terms does so at his own peril." *Paper Exp.*, 972 F.2d at 757; *accord Randazzo v. Harris Bank of Palatine, N.A.*, 262 F.3d 663, 670 (7th Cir. 2001). Under these principles, Ace had no duty to inform Respondents of the changes to the contract. Respondents expressed assent to the Agreements by signing the documents.

*Procedural Unconscionability*

Respondents further allege the arbitration clauses cannot be enforced because of procedural unconscionability. Under Illinois law, "[p]rocedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 264 (Ill. 2006). The two June 2009 Agreements sent to Respondents were less than 18 pages long in total. Moreover, both clauses contain the title "**<u>Arbitration of Disputes</u>**" (in bold print and underlined), and the word "arbitrate" appears at least 12 times on the signature page of the Membership Agreement. The arbitration clauses were inserted directly above the signature lines of the Agreements. Given the placement and language of the brief arbitration clauses in the

9

second set of Agreements, Respondents can make no showing that the arbitration clauses were too difficult to find, read, or understand. Thus, Respondents' claim of procedural unconscionability also fails.

*Fraud*

Finally, Respondents allege the arbitration provisions of the second set of Agreements are unenforceable because they were formed by fraud.

> In order to state a claim for common law fraud under Illinois law, a plaintiff must allege: (1) the defendant made a false statement of material fact; (2) the defendant knew the statement to be false; (3) the defendant made the statement intending to induce the plaintiff to undertake some act; (4) the plaintiff reasonably relied upon the truth of the statement; and (5) the plaintiff suffered damages as a result of his reliance.

*Duffy v. TicketReserve, Inc.*, 722 F. Supp. 2d 977, 991 (N.D. Ill. 2010). In the letter sent to Respondents, accompanying the second set of Agreements, the only changes to the Agreements mentioned relate to the store address; no mention is made of the insertion of the arbitration clauses. While this might arouse suspicion of fraud, Illinois law further provides, "[a]s long as the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so, Illinois courts have refused to extend the doctrine of fraudulent inducement to invalidate contracts." *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574-75 (7th Cir. 2001) (quoting *Adler v. William Blair & Co.*, 648 N.E.2d 226, 232 (Ill. App. Ct. 1995)); *see also Dugan v. R.J. Corman R. Co.*, 344 F.3d 662, 667 (7th Cir. 2003) (providing there is no "I didn't read it" defense). Having the opportunity to read a contract to discover a fraud defeats a charge of fraud under Illinois law. *See Richardson v. Rush Presbyterian St. Luke's Medical Center*, 63 Fed. App'x. 886, 891 (7th Cir. 2003) (finding plaintiff's argument that defendant "secretly added" a provision to a contract unavailing, where plaintiff had the

opportunity to discover the provision, and citing to *Nilsson v. NBD Bank of Ill.*, 731 N.E.2d 774, 783 (1999)).

Given that the arbitration provisions in both June 2009 Agreements appear directly above the signature lines and, in one agreement, the word "arbitrate" appears at least a dozen times, Respondents could have easily discovered the purported fraud had they simply examined the contracts in the three weeks between receiving them and remitting them, signed. Therefore, Respondents' claim of fraud also fails as a matter of law.

## CONCLUSION

Respondents have failed to identify a triable issue of fact concerning the arbitration provisions in the Agreements they executed with Ace. There is no basis to find the arbitration provisions unenforceable.

Because a valid contract existed between the parties based on the second set of executed Agreements, the parties agreed to be bound to the Commercial Arbitration Rules. Therefore, the parties have demonstrated their intent to "leave questions of arbitrability to the arbitrator." *Yellow Cab Affiliation, Inc. v. New Hampshire Ins. Co.*, No. 10-cv-6896, 2011 WL 307617, at *5 (N.D. Ill. Jan. 28, 2011).

For the reasons set forth above, Ace's Motion to Compel Arbitration is granted.

Date: 10-18-12

JOHN W. DARRAH
United States District Court Judge